**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

Laurent W. Britton, Decedent/Employee, and Marsha P. Britton, Claimant, Respondents,

v.

Charleston County, Employer, and SC Association of Counties SIF, Carrier, Appellants.

Appellate Case No. 2016-000595

———————

Appeal From The Workers' Compensation Commission

———————

Unpublished Opinion No. 2018-UP-368
Heard May 17, 2018 – Filed September 19, 2018

———————

**AFFIRMED**

———————

Joseph Hubert Wood, III, of Wood Law Group, LLC, of Charleston, and Grady Larry Beard, Nicolas L. Haigler, and Eve S. Goodstein, of Sowell Gray Robinson Stepp & Laffitte, LLC, of Columbia, for Appellants.

James K. Holmes, of The Steinberg Law Firm, LLP, of Charleston, and R. Walter Hundley, of R. Walter Hundley Law Firm, of Charleston, for Respondent.

———————

**MCDONALD, J.:**  In this workers' compensation matter, Appellants Charleston County (the County) and the South Carolina Association of Counties Second Injury Fund (Carrier) appeal the Appellate Panel of the South Carolina Workers' Compensation Commission's (the Commission's) order, which "Affirmed in Full" the order of the single commissioner.  The single commissioner awarded compensation to Respondent Marsha Britton (Claimant), finding the death of her fifty-eight-year-old husband, Laurent "Larry" Britton (Decedent), was the result of a compensable heart attack arising out of and in the course of his employment as manager of the Charleston County Radio Communications Department (the Department).  Appellants contend the Commission erred in finding Decedent's heart attack compensable, failing to properly apply the heightened heart attack standard, and failing to make sufficient findings of fact.  Appellants further challenge the Full Commission's issuance of an order denying their motion for rehearing by the Full Commission.  We affirm.

**Facts and Procedural History**

At 7:23 p.m. on Monday, September 8, 2014, courtesy officers reported an assault involving a small weapon at the Garden Apartments in the West Ashley area of the City of Charleston.  The Charleston County Sheriff's Office (the Sheriff's Office) responded to the scene and attempted to make contact with the suspect, who had barricaded himself in an apartment.  The suspect exchanged gunfire with Deputies Michael Ackerman and Joseph Matuskovic.  At approximately 7:36 p.m., a call came over the radio reporting "shots fired, officers down."  Emergency Medical Services (EMS) subsequently transported Deputies Ackerman and Matuskovic to the Medical University of South Carolina (MUSC).  Deputy Ackerman underwent surgery; Deputy Matuskovic died upon his arrival at MUSC.

A nine-hour standoff ensued; multiple law enforcement agencies and emergency response units responded to the Garden Apartments.[1]  Upon entering the suspect's apartment at approximately 4:00 a.m. on September 9, 2014, the Charleston Police Department SWAT team found the suspect unresponsive.[2]

---

[1] More than 100 first responders responded to the scene.

[2] Charleston County Coroner Rae Wooten testified the suspect died from wounds suffered in the gunfire exchange with Deputies Ackerman and Matuskovic.

Decedent was attending a Fraternal Order of Police (FOP) dinner in Hanahan when he learned of the incident. He called radio technician Martin Kratz at approximately 8:11 p.m., to report the shooting and instruct Kratz to contact the Sheriff's Office to determine its needs. Kratz spoke with Decedent again at 8:27 p.m., to report on his contact with the Sheriff's Office; Decedent instructed Kratz to meet him at the Department in North Charleston. Decedent then called his supervisor, Charleston County Director of Radio and Telecommunications William "Bill" Tunick, at 8:36 p.m. to discuss the developing situation.

When Kratz arrived at the Department, he found Decedent monitoring the radio system. They discussed the equipment needed for the West Ashley command post; Kratz then took the equipment to the command post while Decedent remained in the equipment room monitoring the radio system. Over the next several hours, the two exchanged numerous telephone calls and text messages. According to Kratz and Tunick, no congestion or breakdown in the radio system occurred during the standoff.

At 1:25 a.m. on Tuesday, September 9, 2014, Decedent called 911 to report multiple physical complaints, including shortness of breath and chest pain. When the Sheriff's Office advised Kratz of Decedent's 911 call, Kratz left the command post and returned to the Department, where he unlocked the doors for EMS and directed them upstairs to the equipment room. EMS transported Decedent to MUSC, where he died of an apparent heart attack at approximately 3:05 a.m.

Charleston County submitted a workers' compensation claim on behalf of Claimant and Carrier denied the claim. Claimant subsequently filed a Form 52, alleging Decedent died as the result of a compensable heart attack; Appellants filed a Form 53 denying the claim. The matter was heard by the single commissioner on June 19, 2015.

Although Decedent had a family history of heart disease, he had no prior treatment for or complaints related to heart issues before his fatal heart attack. EMS records state he had "no cardiac history" and "no coronary artery disease." Claimant's longtime family physician and expert witness, Dr. William Wilson, opined that "due to the unexpected strain and overexertion on September 8 and 9, 2014, [Decedent] died of a sudden acute myocardial infarction while providing law enforcement support under unusual and extraordinary conditions of employment."

In finding Decedent's heart attack compensable, the single commissioner noted that "[e]very single witness at the hearing, including [Appellants'] witnesses, testified

that the circumstances surrounding the standoff were unusual/or not typical."[3]  The single commissioner held Claimant was entitled to funeral benefits and five-hundred weeks of compensation in a commuted lump sum.  The Commission unanimously affirmed, and the Full Commission unanimously denied Appellants' subsequent Rule 59(e) motion.

**Standard of Review**

The Administrative Procedures Act (APA) establishes the "substantial evidence" rule as the standard of review for decisions of the Commission.  *Lark v. Bi-Lo, Inc.*, 276 S.C. 130, 133–35, 276 S.E.2d 304, 306 (1981).  "Substantial evidence is 'not a mere scintilla of evidence nor the evidence viewed blindly from one side of the case, but is evidence which, considering the record as a whole, would allow reasonable minds to reach the conclusion that [the Commission] reached or must have reached' to support its orders."  *Lewis v. L.B. Dynasty, Inc.*, 419 S.C. 515, 518, 799 S.E.2d 304, 305 (2017) (quoting *Lark*, 276 S.C. at 135, 276 S.E.2d at 306).  "In workers' compensation cases, the Full Commission is the ultimate fact finder."  *Shealy v. Aiken Cty.*, 341 S.C. 448, 455, 535 S.E.2d 438, 442 (2000).  Accordingly, an appellate court "must affirm the findings of fact made by the [F]ull [C]ommission if they are supported by substantial evidence."  *Tennant v. Beaufort County Sch. Dist.*, 381 S.C. 617, 620, 674 S.E.2d 488, 490 (2009).

**Law and Analysis**

**I.    Compensable Injury**

Appellants argue the Commission erred in finding Decedent's fatal heart attack compensable.  We disagree.

"In determining whether a work-related injury is compensable, the Workers' Compensation Act [(the Act)] is liberally construed toward the end of providing coverage rather than noncoverage in order to further the beneficial purposes for which it was designed."  *Shealy*, 341 S.C. at 455, 535 S.E.2d at 442.  "Any reasonable doubt as to the construction of the Act will be resolved in favor of coverage."  *Id.* at 455–56, 535 S.E.2d at 442.  The Act defines a compensable injury as "only injury by accident arising out of and in the course of the employment and shall not include a disease in any form, except when it results naturally and unavoidably from the accident except such diseases as are

---

[3] The Commission and Full Commission echoed this finding.

compensable under the provisions of Chapter 11 of this title." S.C. Code Ann. § 42-1-160 (2015). "It is well settled in this state that a heart attack suffered by an employee constitutes a compensable accident if it is induced by unexpected strain or overexertion in the performance of the duties of employment or by unusual and extraordinary conditions in the employment." *Fulmer v. S.C. Elec. & Gas Co.*, 306 S.C. 34, 36, 410 S.E.2d 25, 26 (Ct. App. 1991). "However, it is equally clear that, if a heart attack results as a consequence of the ordinary exertion that is required in the performance of employment duties in the ordinary and usual manner, and without any outward untoward event, it is not compensable as an accident." *Id.* at 36, 410 S.E.2d at 26–27.

Appellants contend the Commission erred in finding the conditions of Decedent's employment on the night of the armed standoff were unusual and extraordinary because the Commission "focused exclusively on the unfortunate fact that two officers were shot in an exchange of gunfire with a suspect, an event the Decedent was neither present for nor participated in by way of radio." They cite *Bentley v. Spartanburg County*, 398 S.C. 418, 427, 730 S.E.2d 296, 301 (2012), for the proposition that "[t]he only issue is whether the employment condition was extraordinary and unusual with respect to" Decedent's position as the radio communications manager.

Abundant evidence supports the Commission's finding. For example, Decedent's long hours on September 8 and 9, 2014, were a contributing factor to the "unusual and extraordinary conditions" of his employment, which resulted in his fatal heart attack. *See Kearse v. S.C. Wildlife Res. Dep't*, 236 S.C. 540, 542–43, 115 S.E.2d 183, 184–85 (1960) (explaining that although some of the activities were of the nature usually performed by the game warden, the combination of late hours, frigid weather, extreme exertion, and rough terrain, which continued uninterrupted over an unusual length of time, constituted unusual or extraordinary conditions); *S.C. Second Injury Fund v. Liberty Mut. Ins. Co.*, 353 S.C. 117, 125, 576 S.E.2d 199, 204 (Ct. App. 2003) (affirming the circuit court's decision that substantial evidence supported the Full Commission's determination of unusual and extraordinary employment conditions based on the testimony of the decedent's supervisor that he had only experienced one other similar fire in forty years of farming and that he would "never forget it," as well as other evidence indicating an abnormally stressful work environment on the day of decedent's fatal heart attack).

Decedent left work at his normal time on September 8, 2014.[4]  However, upon being notified of the officer shootings and standoff in West Ashley, Decedent returned to the Department from the FOP dinner at approximately 8:37 p.m., where he remained in the equipment room monitoring the radio system even after he began experiencing shortness of breath and chest pain.  He called 911 at 1:25 a.m.

In their respective testimonies, Claimant, Tunick, and Charleston County Sheriff Al Cannon acknowledged the occurrence of several "unusual and extraordinary conditions" in Decedent's employment on September 8 and 9.  Claimant testified Decedent was alone at the Department; Decedent bore the heavy responsibility of keeping more than one hundred first responders in communication; Decedent experienced a different kind of stress because he believed his friend had been shot and killed; and Decedent had not experienced the death of a Charleston County deputy in the line of duty during his employment with the Department.  Regarding their September 8, 2014 call, Tunick testified:

> [Decedent] was—sounded very stressed because, obviously, it's a very sad occurrence when a police officer gets shot and killed, and he felt—so he basically informed me that this incident was ongoing and he had to go to the radio shop, that Martin was going to go into the scene itself, he was going to the radio shop to help manage the incident, the com[munications] incident, the com[munications] portion of the incident and—but he— at that time he told me he felt—he thought that the person—that the police officer that was killed was a friend of his, a good friend of his.  It was not known who was down at that point, but through word of mouth, I guess, he had thought that this was someone that he knew very well.  He was mistaken when the name of the officer was released.

Sheriff Cannon, who testified by deposition, explained that the standoff and shootings were "unique" and "extraordinary" within the definition of "emergency," and that to describe the circumstances as exceptional or unusual would be an "understatement."  In a February 2015 letter, Sheriff Cannon wrote,

---

[4] Decedent's regular hours were 7:30 a.m. to approximately 3:30 p.m. or 4:00 p.m.

The circumstances under which [Decedent] was called to perform his duties were extremely rare and unusual and extraordinarily stressful and traumatic.  This assessment is based on having commanded law enforcement agencies for over thirty (30) years and having dealt during that time with all manner of tragic situations and disasters.

Evidence of the importance of keeping the communications systems running and congestion-free during a crisis situation was also presented.  Coroner Wooten's testimony indicated that communications systems failed during the 2007 Sofa Super Store Fire, resulting in subsequent improvements to the County's system.  She stated, "We learned a lot during that time about how communication could help, hinder, impact our response."

Charleston County EMS Medical Director Dr. Ralph Shealy testified,

[T]here are many ways in which communications can fail during a crisis. . . .  [I]n disasters[,] the most common failure is a communications failure, which then precipitates failures of—that follow from that.  We spend a great deal of time in our training for disaster response solving problems relating to communications because of their criticality. . . .  [T]he issue of communications is always a critical factor.  If there are too many people trying to use the system at the same time, the system fails, and one of the critical disciplines is to try to restrict radio communications to keep the channels open so that critical information can be transmitted as a general principle.  There are technical issues as well . . . .  I'm not a technical electronics person, and I can't describe that in detail.  But I understand that in an event, especially an event in which there are many people on the scene—in this particular event, there were law enforcement officers from agencies from many miles away[,] who had responded to that location.  There were hundreds of officers and all were in need of some kind of radio access.  So it was a potential overload, and—and we all understood that we need to keep off the air because if we didn't[,] the system could shut down.

In response to being asked whether he would classify the emergency situation in this case as "usual or normal," Dr. Shealy responded, "I've been doing this [thirty-five] years, sir, and this was the only time this ever happened to me." Based on this testimony, as well as the fact that Decedent was responsible for keeping the lines of communication open for more than 100 first responders during the unique emergency situation in this case, we find no error in the Commission's finding that Decedent's fatal heart attack was "induced by unexpected strain or overexertion in the performance of the duties of employment or by unusual and extraordinary conditions in the employment." *Fulmer*, 306 S.C. at 36, 410 S.E.2d at 26–27.

While some of the circumstances and activities of September 8 and 9, 2014, may not have been uncommon to Decedent's employment, substantial evidence supports the Commission's finding that his death occurred under "unusual and extraordinary conditions" and was, thus, compensable. *See e.g.*, *Kearse*, 236 S.C. at 542–43, 115 S.E.2d at 184–85 ("The phrase 'unusual or excessive strain' . . . is not so limited in its meaning as to include only work of an entirely different character from that customarily done.").

## II.    Decedent's Job Description and *Bentley*

We find Appellants' argument that the Commission failed to consider Decedent's job description, which required him to "be available 24/7 for emergencies," to be without merit because the Commission specifically referenced Decedent's job description as "Defendant's APA.17" in finding 6 of its order. Nor do we find the Commission failed to correctly apply the heart attack standard as considered in *Bentley*, 398 S.C. at 431, 730 S.E.2d at 303.

In *Bentley*, our supreme court found:

> Appellant would like this Court to reframe the issue, take it out of its particular employment context, and ask "whether killing another human being is 'unusual.'" This approach, however, contradicts *Shealy's* command to look at conditions of the particular employment in which the injury occurs and not to conditions of employment in general. Appellant also argues that because statistics show that the killing of suspects by a Spartanburg County deputy sheriff occurred about once a year, this meant that shooting and killing was an unusual and extraordinary

event.  However, in defining what constitutes unusual and extraordinary, the statute and our case law speak of conditions of employment and not the frequency of an event occurring.  Moreover, if the frequency of killing is the decisive factor, then it is difficult to put a precise number on how many suspects must be killed before the killing ceases to be extraordinary and unusual.  Under our case law, we cannot ignore the particular employment context and hold that killing a suspect is generally and inherently extraordinary and unusual.

*Id.* at 430, 730 S.E.2d at 302–03 (citations omitted).  Here, in recognizing and considering Decedent's job duties and description, the Commission could not ignore the fact that "<u>every single witness testified that the circumstances regarding the standoff/shootings were unusual and/or not typical; not a single witness testified to the contrary</u>[.]"  (emphasis in original).  *Bentley* considered a claim for mental-mental injury governed by a statute not applicable in this death case, and its facts are distinguishable.  We find no error.

### III.    Findings of Fact

Appellants argue the Commission erred in failing to make sufficient findings of fact.  We disagree.

The APA mandates that "[a] final decision shall include findings of fact and conclusions of law, separately stated.  Findings of fact, if set forth in statutory language, shall be accompanied by a concise and explicit statement of the underlying facts supporting the findings."  S.C. Code Ann. § 1-23-350 (2005); *see also Grant v. Grant Textiles*, 372 S.C. 196, 203, 641 S.E.2d 869, 872 (2007) ("By simply repeating the statute's language, with little else, the full commission's decision failed to comply with this requirement.").

Appellants maintain the Commission violated the APA because it "unequivocally failed to provide a single finding of fact or conclusion of law as to the seminal issue in this matter—whether the conditions of the Decedent's employment on the night in question were unusual and extraordinary."  But our review of the order reflects at least seven findings of fact relevant to this inquiry.  As these seven findings of fact set forth more than simply the statutory language, *see* S.C. Code Ann. § 1-23-350, or mere "recital[s] of conflicting testimony followed by a general

conclusion . . . ." *Able Commc'n, Inc. v. S.C. Pub. Serv. Commc'n*, 290 S.C. 409, 411, 351 S.E.2d 151, 152 (1986), we find no error.

**IV.    Regulation 67-709 and Due Process**

Appellants next contend the single commissioner's participation in the Full Commission's unanimous order denying rehearing violated Regulation 67-709 of the Act and their right to due process.  We disagree.

Regulation 67-709 addresses the procedure for Commission review, providing in relevant part:

> A. Commission review may be conducted by a three or six member review panel either of which excludes the original Hearing Commissioner.  An order of a three member review panel has the same force and effect as a six member review panel and is the final decision of the Commission.
>
> B. The Commission's Chair with approval of the majority of the other Commissioners shall assign cases to a three member panel according to the following subsections:
>
> (1) When a Form 30 is filed, the Hearing Commissioner is notified.  If the Hearing Commissioner determines the review involves a novel issue of law or fact, the Hearing Commissioner may request the Commission's Chair set the case for review by a six member review panel.
>
> (2) If the Hearing Commissioner does not request a six member review, the Commission's Chair may assign the review to a three member panel.
>
> (3) The Commission's Chair may appoint by random selection two review panels and exclude, on a rotating basis, one Commissioner from the panels each month.  The Commission's Chair may assign

a case for review as in B(2) above to a three member panel that excludes the original Hearing Commissioner.

The single commissioner, Commissioner Barden, issued her findings of fact, conclusions of law, and order on August 17, 2015. Appellants timely filed their Form 30 request for Commission review on August 27, 2015. Regulation 67-709, upon which Appellants rely in asserting error, governed this appellate review before Commissioners James, McCaskill, and Taylor. Notably—and in accordance with 67-709(A)—Commissioner Barden did not participate in this appellate review.

In 2015, our supreme court recognized a procedural right for a party, on review of a single commissioner's order, to move before the Appellate Panel for rehearing prior to appealing to this court. *See Rhame v. Charleston Cnty. School Dist.*, 412 S.C. 273, 772 S.E.2d 159 (2015) (holding petitioner properly moved for rehearing before the Commission because it makes the ultimate credibility and factual determinations). The court explained:

> The plain language of section 1-23-380(1)[5] indicates that the legislature, by including the phrase "if a rehearing is requested," intended to allow motions for rehearing before all administrative agencies that are governed by the [APA]. *See Lark v. Bi–Lo, Inc.*, 276 S.C. 130, 132, 276 S.E.2d 304, 305 (1981) (noting that the APA was enacted "to provide *uniform* procedures before State Boards and Commissions" (emphasis added)). Section 1-23-380 is titled "Judicial review upon exhaustion of administrative remedies." *See Lindsay v. S. Farm Bureau Cas. Ins. Co.*, 258 S.C. 272, 277, 188 S.E.2d 374, 376 (1972) ("It is 'proper to consider the title or caption of an act in aid of construction to show the intent of the legislature.'" (quoting *Univ. of S.C. v. Elliott*,

---

[5] *See* S.C. Code Ann. § 1-23-380(1) ("Proceedings for review are instituted by serving and filing notice of appeal as provided in the South Carolina Appellate Court Rules within thirty days after the final decision of the agency or, if a rehearing is requested, within thirty days after the decision is rendered. Copies of the notice of appeal must be served upon the agency and all parties of record.").

248 S.C. 218, 221, 149 S.E.2d 433, 434 (1966))).

*Id.* at 276–77, 772 S.E.2d at 160–61.

On January 20, 2016, Appellants sought rehearing as authorized by *Rhame*. However, they captioned their request as a "Motion for Rehearing by the Full Commission."  The Full Commission considered, and unanimously denied, the motion in its Judicial Conference on February 27, 2016.  Chairman Beck signed the order for the Commission; Commissioners James, McCaskill and Taylor (who sat on the Appellate Panel) and Commissioners Barden, Wilkerson, and Campbell (who did not so sit) concurred.

Appellants contend that their due process rights have been violated because single commissioner Barden's concurrence in the unanimous decision of the Full Commission violated Regulation 67-709(A).  But the plain language of Regulation 67-709 applies to Commission, or Appellate Panel, review sought by way of a Form 30.  It does not address motions for rehearing, nor does it contemplate rehearing before the Full Commission as Appellants requested here following their review by a three member Appellate Panel.  Indeed, the last amendment to Regulation 67-709 occurred in 2010, before *Rhame* addressed the availability[6] of motions for rehearing from the Appellate Panel.

We find any error in the single commissioner's participation in the Full Commission's unanimous vote to deny the motion for a rehearing—a motion not required for Appellants to preserve their right to further appellate review—was harmless and did not prejudice Appellants' substantial rights or violate their right to due process.  *See e.g.*, *Olsen v. S.C. Dep't of Health & Envtl. Control*, 379 S.C. 57, 69, 663 S.E.2d 497, 503–04 (Ct. App. 2008) (setting forth the procedural due process requirements of (1) adequate notice, (2) the opportunity for an adequate hearing, (3) the right to introduce evidence, (4) and the right to cross-examine witnesses and reiterating that "[t]he fundamental requirement of due process is the

---

[6] Significantly, while *Rhame* recognized the right to file a motion for rehearing with the Appellate Panel, it did not *require* the filing of such a motion to preserve the right to further appellate review.  *See Rhame*, 412 S.C. at 277, 772 S.E.2d at 161 ("While recognizing the right to file a motion for rehearing to an Appellate Panel, we do not construe the '*if* a rehearing is requested' language to mandate the filing of a motion for rehearing.  This is consistent with general administrative law.").

opportunity to be heard at a meaningful time and in a meaningful manner.  To prevail on a claim of denial of due process, there must be a showing of substantial prejudice.") (internal citations omitted).

**Conclusion**

The Commission's order affirming the single commissioner's award of benefits and the Full Commission's order denying rehearing are

**AFFIRMED.**

**HUFF and GEATHERS, JJ., concur.**